1  **LYNCH CARPENTER, LLP**
   Todd D. Carpenter (State Bar No. 234464)
2  todd@lcllp.com
   Scott G. Braden (State Bar No. 305051)
3  scott@lcllp.com
   James B. Drimmer (State Bar No. 196890)
4  jim@lcllp.com
   1234 Camino Del Mar
5  Del Mar, CA 92014
   Telephone:   (619) 762-1910
6  Facsimile:   (858) 313-1850

7  *Attorneys for Plaintiffs*
   *and Proposed Class Counsel*
8

9                    **UNITED STATES DISTRICT COURT**

10                   **SOUTHERN DISTRICT OF CALIFORNIA**

11 | J.T., J.B., and D.F., individually on behalf | Case No.  **'24 CV 2005 DMS MSB**
12 | of themselves and on behalf of all others |
   | similarly situated, |
13 |                         Plaintiffs, | **CLASS ACTION COMPLAINT**
14 |                    v. |
15 | ASHLYNN MARKETING GROUP, INC., | <u>DEMAND FOR JURY TRIAL</u>
16 | doing business as KRAVE KRATOM, |
   | and DOES 1-50, inclusive, |
17 |                    Defendants. |

18

19

20       Plaintiffs J.T., J.B., and D.F. (collectively, "Plaintiffs")[1] bring this action on behalf

21 of themselves and all others similarly situated against Defendant Ashlynn Marketing

22 Group, Inc., d/b/a Krave, Krave Kratom, and/or Krave Botanicals ("Defendant" or

23 "Krave") and Does 1 through 50, inclusive.

24

25

26 _____
   [1] Because this action concerns issues of addiction and medical status, Plaintiffs are filing
27 under their initials for the sake of their personal privacy. Plaintiffs are reasonable
   consumers who fell victim to Defendant's omissions and misrepresentations about the
28 addictive nature of kratom, which operates like an opioid, and became addicted as a result.
   Since addiction issues are still wrongly stigmatized, Plaintiffs are filing this matter
   anonymously but will reveal their names as necessary to the Court under seal.

## NATURE OF THE ACTION

1.      This is a civil class action against Defendant for its false, misleading, deceptive, and negligent sales practices regarding its kratom powder, capsule, and liquid extract products (collectively, the "Products"). Kratom is both a plant and a drug. The plaint originates from Southeast Asia where its leaves have long been ingested to produce stimulant and opiate-like effects. Use of kratom in the United States was practically non-existent until the last decade. Since then, kratom has become a massively popular substance in the United States. This is because it is currently legal to consume, and because of the stimulant and opiate-like effects produced by its two major alkaloids 7-Hydroxymitragynine ("7-OH") and Mitragynine ("MG").

2.      However, what consumers do not know is that the opiate-like effects produced by MG and 7-OH are not the result of novel chemical interactions in the brain. Rather, these alkaloids are behaving, in part, exactly like opioids. That is, the MG and 7-OH found in the kratom plant activates the same opioid receptors in the human brain as morphine, heroin, and other opiates. Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects.

3.      When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine; they do not think of kratom or expect the "kratom alkaloid" product sold at their local gas stations or corner stores to act like an opioid or have the same addiction and dependency risks as opioids. Kratom is extremely addictive, and as a result, tens of thousands of unsuspecting consumers have developed kratom dependencies that cause them serious physical, psychological, and financial harm.

4.      Defendant has intentionally failed to disclose these material facts regarding the dangers of kratom consumption anywhere on its Products' labeling, packaging, or marketing material. As a result, Defendant has violated warranty law and state consumer protection laws.

5.    Defendant relies on its Products' vague packaging and consumers' limited knowledge of kratom to get unsuspecting people addicted to its Products and reap substantial profits from these addictions. Defendant relies on this ignorance and does nothing to correct it. Such activity is outrageous and is contrary to California law and public policy.

6.    Plaintiffs seek relief in their action individually, and as a class action, on behalf of similarly situated purchasers of Defendant's Products, for the following violations of: (i) California's Unfair Competition Law, Bus. &. Prof. Code § 17200, *et seq.* (the "UCL"); (ii) California's Consumer Legal Remedies Act, Civ. Code § 1750, *et seq.* (the "CLRA"); (iii) California's False Advertising Law, Bus. & Prof. Code § 17500, *et seq.* (the "FAL"); (iv) Oregon's Unlawful Trade Practices Act ("UTPA"), Or. Rev. Stat. § 646.605, *et seq.*; (v) New York Consumer Protection from Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.* (the "NYDAPA"); (vi) New York False Advertising Act, N.Y. Gen. Bus. Law § 350, *et seq.* (the "NYFAA"); (vii) breach of implied warranty; (viii) unjust enrichment; and (ix) fraud by omission.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed Classes, have a different state citizenship from Defendant.

8.    This Court has personal jurisdiction over Defendant because Defendant is an entity with constitutionally sufficient contacts with this District to make personal jurisdiction in this Court proper. Moreover, Krave's principal place of business is in this District.

9.    Venue is proper in this District because Defendant Krave is headquartered in this District. And at least one of the Plaintiffs was harmed by Defendant's actions in this district.

**GENERAL ALLEGATIONS**

A.    **Background and Pharmacology of Kratom**

10.    "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa*, (the "kratom plant") indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century. Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium. Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

11.    Kratom is the most widely used drug in Thailand. This popularity in Thailand does not mean Thailand believes kratom is harmless. To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[2] Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

12.    Kratom's unknown and inconsistent effects have historically been part of its appeal. For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

13.    In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

14.    To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[3]

---

[2] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together. However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[3] When kratom leaves are extracted into a liquid formulation, this is colloquially called a "kratom shot."

15.     The chemicals in the kratom plant which produce a psychoactive effect when ingested are called "alkaloids." "Alkaloids" are a class of various naturally occurring organic chemical compounds. The primary alkaloids in kratom leaves responsible for the kratom's effects are MG and 7-OH.

16.     MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain. Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

17.     Most crucially, MG and 7-OH also interact with the mu-opioid receptor.[4] Yet consumers are largely ignorant of this fact.

18.     For instance, while both 7-OH and MG target the opioid-receptor, 7-OH is more potent than both MG and morphine. In fact, 7-OHMG's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.  Both MG and 7-OH were found to be more potent to the mu-opioid receptor than morphine when taken via oral administration.

19.     Accordingly, kratom products are referred to as a "quasi-opiate" by health professionals because of its opioid-like characteristics.

20.     Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug. The tragedy of addiction is that users want to stop but cannot.

21.     All substances that act on the opioid receptors have a high risk of addiction, and kratom is no exception. Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had. As

---

[4] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia. For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

these doses increase, the body becomes dependent on the drug to feel normal and function properly. When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs. Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug, and can be extremely painful and intolerable to the user.

22.    Indeed, kratom withdrawal symptoms are very similar to those of traditional opioid withdrawal. These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

23.    Users typically start substances like kratom because of how good it makes them feel, but once addicted, they use kratom to avoid the pain and sickness of withdrawal. Use is no longer is about getting high, but about not feeling "sick."

B.    **Kratom Use and Addiction in the United States**

24.    Over the past decade, kratom has exploded in popularity within the United States. As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States. Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

25.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

26.    Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.

27.    Kratom sellers advertise it as a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. Some even assure consumers that kratom is a non-addictive way to deal with opioid withdrawal. These kratom companies universally reiterate these purported "benefits" of kratom consumption, without disclosing any of the corresponding harms of kratom use.

28.    As a result of kratom manufacturers', retailers', and advertisers' failure to warn consumers of kratom's addictive potential, many kratom users find themselves blindsided when they stop taking kratom and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement. Further, because kratom is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid. Some kratom users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

29.    The reports from addicted kratom users are heart-wrenching. Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to kratom, and how difficult it was to stop their kratom use. Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 45,000 members as of September 2024:[5]

    i.    In one post titled **This needs to stop!!! I want to jump CT but the anxiety!**, a user wrote:

I have been doing this shit for 3 months. One of those Krave extracts from the smoke shop. Started one every other day for a months then for six weeks it was almost two I guess it say 6-9gs per serving. Then the last few weeks it's been two a day bc I'm killing myself with the anticipation. Is anyone else's stomach all fucked up from this? Like I havnt passed solid for a while, my gut hurts and seems like my gut health is just really bad. I have gabapentin but I'm so use to it, I have magnesium ready and been taking a multivitamin. I'm so afraid bc I went through a major Oxy habit 7 years ago. Been clean for 7 years from that except I've struggled with alcoholism on and off the last 7 years 6 months sober then go out. It's a cycle and I can't anymore. I'm 28 days sober

---

[5] *See* https://www.reddit.com/r/quittingkratom.

CLASS ACTION COMPLAINT

after a 10 day relapse on drinking but have been on Kratom for the last 3 months and I hate it. Just looking for some support and advice to just make the jump. I bought 20g of powder extract from a reputable store but I can't taper I just can't. I tried maybe over a week I could. With only using for 3 months and not a high amount of shitty extract will am I blowing this outta proportion and making it worse? I just know I have to stop. I also want to know if anyone knows how to fix this guy and stomach issue? My eyes are blood shot and I just feel awful. I want out [….]

a.    **Another user responded:**

Dealing with the same shit. Get out while you can. I've gotten off benzos and alcohol too and Kratom wrecked my body more than those last time (daily use for 3-4 years) lost maybe 40 lbs and looked pale/ghostly and couldn't stomach more than 1 meals and was doing good up until 2 months ago where I relapsed and I'm slowly seeing the bags under my eyes and gut issues again :/ we need off at any cost […] delete all open Kratom shop websites, cut off all contacts or smoke shops […]This is pretty much what I'm going to do in a few days, I just have to work a couple days before I have a week to myself to sweat it out. You got this I could do it once and it really was mostly just a lot of cold sweats, runny nose, RLS and cravings

ii.    In another post titled **I've only only (*sic*) been taking ~3g-4g for several months, probably about 4. I just noticed withdrawal effects when trying to sleep last night and it scared the shit out of me.**, another user wrote:

I didn't really think about how addictive this stuff was, I didn't take it or any reason other than I liked the feeling after working hard all day. I tried to sleep last night and I had the most insane RLS and sweats throughout my entire body; it felt like my bones were electrically charges and trying to escape from my body. It looks like a lot of people have been taking much higher dosages than me and that's completely understandable. I've been taking ~6-10 krave capsules per day for a few months and I'm wondering if folks here think that's enough to justify a full-blown taper. I noticed the taper relies on pure powder and since I take capsules, I'm just trying to figure this out. I have job interviews currently (tech stuff) and really don't want to destroy myself in the process. That said, I really don't want to dig myself any deeper in this stuff and want to get away from it. Any thoughts on this would be greatly appreciated. Much love everyone.

30.    Other experiences with kratom (not necessarily Krave Products) described on the subreddit are similarly horrifying:

iii.    **One user wrot**e:

I started using kratom in pill and powder form a couple years ago. I had no idea it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it

wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

iv.     **Another user shared:**

I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :)

v.      **Another user shared**:

I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly…  Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

31.     This Internet forum is filled with other accounts like these, and the stories are consistently the same—well-meaning people were looking to feel better by taking with what they thought was an "herbal supplement," only to develop an opioid-like addiction. This anecdotal evidence makes clear that kratom's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions. However, Defendant's Products have no information whatsoever warning that kratom is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

32.    Consumers who knew the truth about kratom may not have purchased Defendant's Products or would have paid less than they did for them.

C.    **Defendant Knew or Should Have Known it was Selling a Highly Addictive Drug to Unsuspecting Consumers**

33.    Despite kratom's traditional medical uses, the negative effects of kratom use have long been known and observed, and are well-documented in Southeast Asia where the plant originates and has a long period of historic use. Kratom addiction in Thailand and Malaysia has been studied and documented in the United States by scientists and researchers since at least 1988.

34.    Upon information and belief, Defendant has interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to it.

35.    Even without such interactions, Defendant received numerous user reports about the addictive potential of kratom in the United States.

36.    Defendant therefore knew or should have known that the Products it was selling were highly addictive.

37.    Despite this knowledge, Defendant failed to disclose kratom's addictive potential to its customers on its website or on its Products' packaging.

38.    The furthest Defendant goes in "warning" a consumer about the usage of kratom is buried in a standard disclaimer at the bottom of the "Home" webpage of Defendant's website. Here, Defendant states, "Do not use if you are pregnant or nursing. It is illegal to possess Kratom if under 21 years of age…Consult your healthcare professional before using. Do not combine with alcohol or medication."[6] This disclaimer is a deliberately standard, uniform, and vague disclaimer one could easily find on an alcohol bottle. Defendant's disclaimer is misleading and far from the appropriate warning that consumers are entitled to. Kratom requires a far more detailed and comprehensive description warning consumers of its highly addictive nature, potential for seriously detrimental health effects, and susceptibility for withdrawal. Additionally, Defendant's

---

[6] https://www.kravekratom.com.

disclaimer lacked any information on the recommended usage of the Products, which could lead unsuspecting consumers to using the Products on a daily basis, and further leading to addiction.

39.    Defendant has no excuse for its lack of a detailed disclaimer warning on its Krave Products' packaging of kratom's harms. The pharmacological effects of MG and 7-OH have been thoroughly studied, and it is well-established that kratom acts on the same mu-opioid receptors in the brain as traditional opioids do. Further, there are widespread reports and studies of other addiction and dependency issues.

40.    Defendant therefore knows or should have known that kratom users can develop an addiction. Yet, Defendant fails to disclose this material fact on its advertisements or on its Products' packaging.

41.    Despite this, Defendant markets its kratom Products as if they are nothing more than over-the-counter supplements. Indeed, the packaging looks more like allergy medication than a dangerously strong opioid, and Defendant's website and design language obfuscates the very real truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

42.    Reasonable consumers looking at the Products' packaging would not presume that kratom is highly addictive.

43.    Nowhere on the packaging does Defendant mention that kratom presents the same addiction problems that former opioid users and any other consumer would want to avoid. Consumers seeking help as they come off opioids may be drawn in by Defendant's misleading statements about kratom without knowing that they risk trading one addiction for another.

44.    As a kratom product seller, manufacturer and/or distributor, Defendant occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about kratom.

45.    The information provided on Defendant's Products' packaging in particular is woefully sparse. A representative image of one of Defendant's Products is depicted below:



46.    On Defendant's website where it sells this kratom Product, Defendant does not provide any image of the back of the Product's bottle or show any ingredient list for the Product on the bottle or on the Product's webpage.[7]

47.    Nor does Defendant provide any warning to consumers on the Products' packaging or its website that the Products interact with opioid receptors or are highly addictive and should not be taken on a daily basis, or note any of the numerous negative side effects and withdrawal symptoms caused by its Products.

48.    Indeed, the entire contents of the warning on the Products' packaging is a bog-standard disclaimer—written in miniscule text—that consumers should consult a healthcare provider before use and that Defendants are not liable for "misuse of these products."

---

[7] https://www.kravekratom.com/red-maeng-da-kratom-capsules.

CLASS ACTION COMPLAINT

49. A boilerplate disclaimer is plainly insufficient. This is a Product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

50. Addiction is a disease. As such, Defendant's Krave Products pose an unreasonable health hazard, and Defendant had and has a duty to disclose this fact on its *Products' packaging.*

51. What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain. To the contrary, the packaging proudly states "All Natural." Further, the company logo includes a pleasant-looking green leaf. It looks as innocuous as a vitamin supplement.

52. Defendant, through its misleading advertising and its failure to disclose kratom's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of kratom to better sell its Products and get users addicted to them.

53. Defendant fails to disclose kratom's addictive potential because Defendant knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendant's detriment.

54. By any metric, Defendant's conduct is immoral, unethical, and contrary to California, Oregon, and New York public policy.

55. The United States is going through an opiate crisis that is shaking the foundations of our society. Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosure of its Products' risks through the use of false and misleading packaging and marketing. That cannot—and should not—stand, at least when Defendant's conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

## **PARTIES**

56. Plaintiff J.T. ("J.T.") resides in Rocklin, California. In 2022, J.T. first heard about Krave from a friend and thought it would help treat his anxiety. J.T. was never warned about any risks of taking kratom from his friend or from reading Krave's

packaging. Plaintiff J.T. purchased, and continues to purchase, Krave Products from Happy Cigarettes & Cigars in Auburn, California. J.T.'s use of Krave is currently at its worst, and has been for the past year, as he has been consuming a $10 bag of Krave powder daily. J.T. realized he was addicted about a year ago when he began taking more of it, and experienced sore legs, restlessness, and trouble sleeping without it. J.T. is desperate to quit using Defendant's Krave Products but he has been unable to kick his addiction so far. Had he known that Defendant's Krave Products were highly addictive, by way of a warning on the Products' packaging, he would never have purchased them.

57.    Plaintiff J.B. ("J.B.") is a resident of Williams, Oregon. J.B. first learned about Krave from a friend but heard nothing of any potential risks. In 2016, J.B. first tried Krave when he saw it in a store and bought it because he believed it would give him energy. J.B. purchased the Product from a store in Medford, Oregon. J.B. did not see any warnings on the Krave Product's packaging when he purchased it. J.B.'s addiction reached its low point at the start of 2024. By then, J.B. took approximately 7-8 grams of the powder about five or six times each day. J.B. would finish 250-gram, $40, bags of Defendant's Products *every 3 to 4 days*. J.B. was finally able to quit earlier this year by taking time away from his life to let the withdrawals run their course. It truly was one of the most excruciatingly difficult things he has ever endured. His withdrawals were severe and included prolonged bouts of diarrhea, restless legs, night sweats, and insomnia. Had J.B. known that Defendant's Krave Products were highly addictive, by way of a warning on the Products' packaging, he would never have purchased them.

58.    Plaintiff D.F. ("D.F.") is a resident of Peekskill, New York. D.F. first heard about Krave kratom at a corner store and thought it might help him with physical pain and anxiety because the Products were advertised as plant-based products made for natural energy and pain relief. D.F. was never warned about the risks of taking kratom from the store or from reading the Krave Product's packaging when he purchased it. D.F. purchased Krave Products from the 202 Mobil gas station in Peekskill, New York. D.F.'s use of Defendant's Products increased consistently over time and was at its worst during the

pandemic. For a brief period during the pandemic, store closures prevented D.F. from purchasing Krave Products and he experienced grisly withdrawals, which forced him to confront the realization that he was physically addicted to Defendant's Products. During the height of his addiction, D.F. consumed roughly 14-21 grams of Krave powder per day, costing an average of about $40 each week. D.F. has since succeeded in stopping his use of Defendant's kratom Products. The experience was eye-opening and agonizing. D.F.'s withdrawals included flu-like symptoms, insomnia, sweating, nausea, diarrhea. D.F. has also recently suffered from seizures (a first) that he believes are related to his kratom use. Had D.F. known that Defendant's Krave Products were highly addictive and that he would suffer severe withdrawal symptoms, by way of a warning on the Products' packaging, he would never have purchased them.

59.     Defendant Ashlynn Marketing Group, Inc., doing business as Krave, is a California corporation with its principal place of business in Santee, California. Defendant Krave owns and operates the Krave website, www.kravekratom.com, and also advertises, markets, distributes, and sells its Krave Products in California, New York, Oregon, and throughout the United States.

60.     Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Classes as alleged herein. Plaintiffs reserve the right to amend this Complaint to set forth the true names and capacities of these defendants when they are ascertained, along with appropriate charging allegations, as may be necessary.

## CLASS ALLEGATIONS

61.     Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other Class members, defined as follows:

All persons nationwide who, within the applicable statute of limitations period, purchased Krave kratom products (the "Nationwide Class").

All persons who, within the applicable statute of limitations period, purchased Krave kratom products while in California (the "California Class").

All persons who, within the applicable statute of limitations period, purchased Krave kratom products while in Oregon (the "Oregon Class").

All persons who, within the applicable statute of limitations period, purchased Krave kratom products while in New York (the "New York Class").

62.    Excluded from the Classes is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more subclasses, in connection with their motion for Class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

63.    **Numerosity**: The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain at least thousands of consumers throughout California, New York, Oregon, and the United States who have been damaged by Defendant's conduct as alleged herein. The precise number of members of the Classes is unknown to Plaintiffs at this time.

64.    **Existence and Predominance of Common Questions of Law and Fact**: This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

a.    whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

b.    whether Defendant knew that kratom is a highly addictive substance that causes physical and psychological dependence and opioid-like withdrawal symptoms;

c.    whether Defendant's conduct alleged herein violates the FAL, the CLRA, the UCL, the UTPA, the NYDAPA and/or the NYFAA.

d.    whether Defendant's conduct alleged herein constitutes unjust enrichment;

e.    whether Defendant's conduct constitutes a fraudulent omission;

f.    whether Plaintiffs and the Classes are entitled to damages and/or restitution; and

g.    whether an injunction is necessary to prevent Defendant from continuing to sell its Krave Products without warning labels of their addictiveness.

65.    **Typicality**: Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs and the Class members sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiffs and all others similarly situated that its Products are highly addictive and akin to opioids.

66.    **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Classes.

67.    **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, inter alia, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

68.    Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

69.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs, members of the Classes, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of Defendant's wrongdoing.

70.    Based on the forgoing allegations, Plaintiffs' claims for relief include those set forth below.

71.    Plaintiffs are informed that Defendant keeps extensive computerized records through its online sales data, as well as through, inter alia, general marketing programs. Defendant has one or more databases through which a significant majority of members of the Classes may be identified and ascertained, and Defendant maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

**FIRST CAUSE OF ACTION**
**Violation of California's Unfair Competition Law ("UCL")**
**Bus. & Prof. Code, §§ 17200,** *et seq.*
*(On Behalf of Plaintiff J.T. and the California Class)*

72.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

73.    Plaintiff J.T. brings this cause of action individually and on behalf of the members of the proposed California Class against Defendant.

74.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by unlawful and/or unfair business practices or acts.

75.    As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by (a) representing that its Products have certain

characteristics that they do not, in violation of California Civil Code Section 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of California Civil Code Section 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that its kratom Products pose a serious risk of addiction.

76.    Defendant's conduct has the capacity to mislead a significant portion of the general consuming public and to target consumers, acting reasonably in the circumstances.

77.    Defendant's conduct has injured Plaintiff J.T. and the California Class he seeks to represent in that they paid money for a Product that they would not have purchased or paid more than they would have but for Defendant's failure to disclose the addictive nature of its kratom Products. Such injury substantial and is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also Defendant's omissions, consumers themselves could not have reasonably avoided such injury.

78.    Moreover, Defendant's Products pose an unreasonable health hazard because kratom is highly addictive and may induce serious withdrawal symptoms. Accordingly, Defendant had a duty to consumers to disclose on the Products' labels that its kratom Products pose a risk of physical and psychological dependence.

79.    Pursuant to California Business and Professions Code Section 17203, Plaintiff J.T. and the California Class members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff J.T. and the other California Class members; (b) disgorge all revenues obtained as a result of Defendant's violations of the UCL; and (c) pay Plaintiff J.T. and the California Class members' attorneys' fees and costs.

80.    Here, equitable relief is appropriate because Plaintiff J.T. may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products.

Without compensation for the full premium price of the Products, Plaintiff J.T. would be left without the parity in purchasing power to which he is entitled.

## SECOND CAUSE OF ACTION
### Violation of California's False Advertising Law ("FAL")
### Bus. & Prof. Code, §§ 17500, *et seq.*
### *(On Behalf of Plaintiff J.T. and the California Class)*

81.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

82.     Plaintiff J.T. brings this claim individually and on behalf of the California Class against Defendant.

83.     Defendant's acts and practices, as described herein, have deceived, and are likely to continue to deceive, California Class members and the public at large. As described above and throughout this Complaint, Defendant failed to disclose that kratom is addictive on its Products' packaging.

84.     Defendant disseminated uniform advertising regarding its kratom Products to and across California. This advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of the FAL.  Such advertisements were intended to, and likely did, deceive the consuming public for the reasons detailed herein.

85.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive because Defendant continues to misrepresent that kratom is not addictive.

86.     Defendant knew, or should have known, that in making and disseminating these statements, its advertisements were untrue and misleading in violation of California law. Defendant knows that kratom is addictive yet fails to disclose this fact to consumers.

87.     Plaintiff J.T. and the California Class members purchased Defendant's Products based on Defendant's misrepresentations and omissions indicating that kratom is not addictive.

88.     Defendant's misrepresentations and non-disclosures of the material facts described herein constitute false and misleading advertising and, therefore, constitute a violation of the FAL.

89.     As a result of Defendant's wrongful conduct, Plaintiff J.T. and the California Class members lost money in an amount to be proven at trial. Plaintiff J.T. and the California Class are therefore entitled to restitution as appropriate for this cause of action.

90.     Plaintiff J.T. and the California Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code Civil Procedure Section 1021.5; and other appropriate equitable relief.

### THIRD CAUSE OF ACTION
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code, §§ 1750, *et seq.***
***(On Behalf of Plaintiff J.T. and the California Class)***

91.     Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

92.     Plaintiff J.T. brings this claim individually and on behalf of the California Class against Defendant.

93.     Plaintiff J.T. and California Class members are consumers within the meaning of California Civil Code Section 1761(d) of the CLRA.

94.     Civil Code Section 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or he does not have."

95.     Civil Code Section 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

96.     Civil Code Section 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

97.     Defendant violated Civil Code Sections 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that its Products are addictive, an unreasonable health hazard and necessarily a fact which is material to reasonable consumers.

98.     Defendant's misrepresentations and omissions deceived, and have a tendency and ability to deceive, the general public.

99.     Defendant has exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiffs or California Class members.

100.    Plaintiff J.T. and California Class members have suffered harm as a result of these violations of the CLRA, Civil Code Section 1750, because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals.  As a result, Plaintiff J.T. and the California Class are entitled to actual damages in an amount to be proven at trial, reasonable attorneys' fees and costs, declaratory relief, and punitive damages.

101.    On October 18, 2024, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respect with Section 1782(a). The letter was sent via certified mail, return receipt requested, and advised Defendant that it was in violation of the CLRA and demanded Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom. The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers. If Defendant does not respond to Plaintiffs' letter and agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to Section 1782, Plaintiffs will amend this Complaint to seek actual, punitive, and statutory damages, as appropriate against Defendant.

**FOURTH CAUSE OF ACTION**
**Violation of Oregon's Unlawful Trade Practices Act ("UTPA")**
**Or. Rev. Stat. §§ 646.605 *et seq.***
***(On Behalf of Plaintiff J.B. and the Oregon Class)***

102.    Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

103.    Plaintiff J.B. brings this claim individually and on behalf of the members of the proposed Oregon Class against Defendant for violations of the UTPA, Oregon Revised Statutes Section 646.605, *et seq.*

104.   The UTPA is intended to be interpreted liberally to protect consumers, covering a broad spectrum of unfair or deceptive practices in trade or commerce.

105.   The unlawful methods, acts and practices pled herein were committed in the course of Defendant's business.

106.   Defendant is a "person," as defined by Oregon Revised Statutes Section 646.605(4). Defendant is engaged in "trade" and "commerce" in Oregon by advertising, offering or distributing for sale goods that directly or indirectly affect the people of the State of Oregon, as defined by Oregon Revised Statutes Section 646.605(8).

107.   Defendant's kratom Products are "goods" that Plaintiff J.B. and the proposed Oregon Class obtained primarily for personal purposes, as defined by Oregon Revised Statutes Section 646.605(6).

108.   Oregon Revised Statutes Section 646.608(1)(e) states that it is an unlawful business practices for a company to represent that their goods sold have characteristics, ingredients, uses, or benefits that they do not have. This provision is specifically intended to prevent economic harm based on deceptive commercial practices and extends to omissions.

109.   A "representation" under Oregon Revised Statutes Section 646.608(1) is any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact.

110.   The Supreme Court of Oregon has clarified that for a defendant to violate the UTPA provisions prohibiting misrepresentations about a product's attributes, it is not required that the misrepresentations be material to consumer purchasing decisions. *See State ex rel Rosenblum v. Living Essentials, LLC*, 371 Or. 23 (2023). This means that any misrepresentation about the product, regardless of its influence on the purchasing decision, can be actionable under the UTPA.

111.   Defendant has further engaged in "unconscionable tactics" by knowingly taking advantage of consumers' physical infirmity and ignorance, and knowingly

permitting customers to enter into transactions in which the customer will derive no material benefit. Oregon Revised Statutes Section 646.605(9).

112. Defendant's unlawful omissions, acts, and practices pled herein were "willful violations" of Oregon Revised Statutes Section 646.608 because Defendant knew or should have known that Defendant's conduct was a violation, as defined by Oregon Revised Statutes Section 646.605(10).

113. Defendant's methods, acts and practices, including Defendant's representations, omissions, active concealments and failures to disclose, violated and continue to violate the UTPA.

114. With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because (i) Defendant had exclusive knowledge of material information that was not known to Plaintiff J.B. and the Oregon Class (i.e., that kratom is highly addictive); (ii) Defendant concealed material information from Plaintiff J.B. and the Oregon Class (i.e., that kratom is highly addictive); and/or (iii) Defendant made partial representations which were false and misleading absent the omitted information.

115. Defendant's misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

116. Defendant engaged in these reckless or knowing use of these unlawful methods, acts or practices alleged herein which have been declared unlawful by the UTPA.

117. As a direct, substantial and/or proximate result of Defendant's conduct, Plaintiff J.B. and the Oregon Class members suffered compensable and ascertainable losses.

118. Plaintiff J.B. and the Oregon Class members would not have purchased the Products at the prices they paid if they had known the harmful opioid-like effects of kratom consumption and/or its addiction and withdrawal symptoms.

119. Plaintiff J.B. seeks on behalf of himself and the Oregon Class: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive

damages; (3) appropriate equitable relief, including injunctive and restitution, as appropriate; and (4) attorneys' fees and costs pursuant to Oregon Revised Statutes Section 646.638, *et seq.*

120.    Under the UTPA, a private plaintiff may seek an injunction as may be necessary to ensure cessation of unlawful business and trade practices. Oregon Revised Statutes Section 646.636. The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct. Defendant's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff J.B. seeks an order enjoining Defendant from committing such unlawful practices pursuant to Oregon Revised Statutes Section 646.638(8)(c); Oregon Revised Statutes Section 646.636. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff J.B., the Oregon Class members, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff J.B., the Oregon Class members, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Plaintiff J.B. is informed and believes and thereon alleges that Defendant's unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendant will or may continue to injure Plaintiff J.B. and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

121.    This action was brought "within one year after the discovery of the unlawful method, act or practice." Oregon Revised Statutes Section 646.638(6). By Defendant's design, its misrepresentations and omissions regarding the effects of the ingredients in its kratom Products made it virtually impossible for the typical consumer to discover the truth. Plaintiff J.B. and members of the proposed Oregon Class were reasonable consumers who trusted Defendant's representations when they purchased Defendant's kratom Products.

## FIFTH CAUSE OF ACTION
**Violation of New York's Consumer Protection from Deceptive Acts and Practices Act ("NYDAPA")**
**N.Y. Gen. Bus. Law §§ 349, *et seq.***
*(On Behalf of Plaintiff D.F. and the New York Class)*

122. Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

123. Plaintiff D.F. brings this cause of action individually and on behalf of the members of the proposed New York Class against Defendant for violations of the NYDAPA, N.Y. General Business Law Section 349, *et seq.*

124. NYDAPA makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. General Business Law Section 349. Defendant's conduct, as set forth herein, constitutes deceptive acts or practices under this section.

125. Plaintiff D.F. and members of the proposed New York Class are "persons" under the NYDAPA, N.Y. General Business Law Section 349(h), and Defendant's actions as set forth herein occurred in the conduct of "business, trade or commerce" under the NYDAPA.

126. In the course of its business, Defendant marketed its kratom Products in such a way that gave consumers, including Plaintiff D.F. and members of the proposed New York Class, the impression that its Products were safe to consume and did not cause any opioid-like addiction and withdrawal symptoms; therefore, leading to the false impression that Defendant's Products were worth more than they actually were.

127. Plaintiff D.F. and members of the proposed New York Class had no way of discerning that Defendant's representations were false and misleading.

128. Defendant thus violated and continues to violate NYDAPA by making statements that, when considered from the perspective of a reasonable consumer, give the false impression that Defendant's kratom Products are safe to consume and do not cause opioid-like effects and withdrawal symptoms.

129. Defendant knew or should have known that its conduct violated NYDAPA and Defendant owed a duty to Plaintiff D.F. and members of the proposed New York Class

1   to refrain from engaging in deceptive acts or practices, and to disclose the truth about
2   kratom's harms.

3   130.   Defendant made affirmative misrepresentations and omissions when it failed
4   to disclose material facts regarding the harms of its kratom Products with the intent to
5   mislead Plaintiff D.F. and members of the proposed New York Class.

6   131.   Defendant's misleading and false advertising regarding the addictive nature
7   of kratom was material to Plaintiff D.F. and members of the proposed New York Class, as
8   they relate to the safety of the Product the consumer received and paid for. A reasonable
9   consumer would attach importance to such representations and would be induced to act
10  thereon in deciding whether or not to purchase the product.

11  132.   Defendant's unfair and/or deceptive acts or practices were likely to and did
12  deceive reasonable consumers, including Plaintiff D.F. and members of the proposed New
13  York Class. Plaintiff D.F. and members of the proposed New York Class reasonably relied
14  upon Defendant's misrepresentations and omissions when purchasing Defendant's kratom
15  Products. Plaintiff D.F. and members of the proposed New York Class would not have
16  purchased Defendant's Products but for Defendant's failure to disclose kratom's
17  composition, addictive nature, and the negative side effects and withdrawal symptoms that
18  would result from use of Defendant's Products.

19  133.   Defendant's violations of NYDAPA, through its unlawful, unfair, and
20  fraudulent business practices, are ongoing and present a continuing threat that Plaintiff
21  D.F., members of the proposed New York Class, and the public will be deceived into
22  purchasing Products based on Defendants misrepresentations and omissions regarding the
23  purported "benefits" and actual harms posed by its kratom Products. These
24  misrepresentations lead to financial damage for consumers like Plaintiff D.F. and members
25  of the proposed New York Class who would not have bought Defendant's Products had
26  they known kratom's true nature.

27  134.   As a direct and proximate result of Defendant's misleading and false
28  advertisements, as well as Defendant's deceptive and unfair acts and practices made during

the course of Defendant's business, Plaintiff D.F. and members of the proposed New York Class suffered ascertainable loss and actual damages.

135.    Plaintiff D.F. and members of the proposed New York Class are entitled to all of the damages, remedies, fees, and costs available under NYDAPA, including but not limited to, injunctive relief, recovery of actual damages and/or fifty dollars in statutory damages, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

### SIXTH CAUSE OF ACTION
**Violation of New York False Advertising Act ("NYFAA")**
**N.Y. Gen. Bus. Law §§ 350,** *et seq.*
***(On Behalf of Plaintiff D.F. and the New York Class)***

136.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

137.    Plaintiff D.F. brings this claim individually and on behalf of the proposed New York Class against Defendant for violations of the NYFAA, N.Y. General Business Law Section 350.

138.    The NYFAA makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. General Business Law Section 350. False advertising includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of such representations [made] with respect to the commodity . . ." N.Y. General Business Law Section 350(a).

139.    Defendant's misrepresentations and omissions in its Products' packaging, marketing, and website descriptions regarding the true nature, composition, and harms of its kratom Products constitute an unfair, untrue, and misleading practice. This deceptive marketing practice gave consumers the false impression that Defendant's Products were natural and/or safe to consume, and therefore lead to the false impression that the Products sold by Defendant were worth more than they actually were.

140.    Defendant misled consumers by making untrue and misleading statements and failing to disclose material facts regarding the true nature and effects of its kratom Products with the intent to mislead Plaintiff D.F. and members of the proposed New York Class.

141.    Defendant's unfair and deceptive acts or practices were likely to, and did, deceive reasonable consumers, including Plaintiff D.F. and members of the proposed New York Class, about the real harmful nature of its kratom Products. Plaintiff D.F. and members of the proposed New York Class reasonably relied upon Defendant's misrepresentations when purchasing Defendant's Products. Plaintiff D.F. and members of the proposed New York Class would not have purchased Defendant's Products but for Defendant's misrepresentations and omissions regarding the true nature of kratom and the effects of the ingredients in its kratom Products.

142.    Defendant's violations of the NYFAA, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Plaintiff D.F., members of the proposed New York Class, and the public will be deceived into purchasing Products based on Defendant's misrepresentations and omissions regarding the harmful and addictive nature of its Products. These misrepresentations and omissions by Defendant lead to financial damage for consumers like Plaintiff D.F. and members of the proposed New York Class.

143.    As a direct and proximate result of Defendant's misleading and false advertisements, as well as Defendant's deceptive and unfair acts and practices made by Defendant's business, Plaintiff D.F. and members of the proposed New York Class suffered ascertainable loss and actual damages.

144.    Plaintiff D.F. and members of the proposed New York Class are entitled to all the damages, remedies, fees, and costs available under the NYFAA, including, but not limited to, injunctive relief, recovery of actual damages and/or $500 per violation, whichever is greater, as well as treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## SEVENTH CAUSE OF ACTION
### Breach of Implied Warranty
### *(On Behalf of Plaintiffs and the Nationwide Class)*

145.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

146.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

147.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that kratom is not addictive and does not cause opioid-like withdrawal symptoms because it did not provide disclosure on the Products' packaging stating otherwise.

148.    Defendant breached its warranty implied in the contract for the sale of its kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiffs and the Nationwide Class members, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals. U.C.C. Sections 2-313(2)(a), (e), (f). As a result, Plaintiffs and the members of the Nationwide Class did not receive the goods as impliedly warranted by Defendant to be merchantable.

149.    Plaintiffs and the Nationwide Class members purchased the Products in reliance upon Defendant's skill and judgement and the implied warranties of fitness for the purpose.

150.    The kratom Products were defective when they left Defendant's exclusive control.

151.    Plaintiffs and the Nationwide Class did not receive the goods as warranted.

152.    As a direct and proximate cause of Defendant's breach of its implied warranty, Plaintiffs and the Nationwide Class have been injured and harmed because (i) they would not have purchased Defendant's Products on the same terms if they knew that the Products

were addictive and could cause opioid-like withdrawal symptoms; and (ii) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

153.    On October 18, 2024, Plaintiffs' counsel sent Defendant a notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. Sections 2-314 and 2-607. This notice letter advised Defendant that it had breached an implied warranty and demanded Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

### EIGHTH CAUSE OF ACTION
**Unjust Enrichment**
***(On Behalf of Plaintiffs and the Nationwide Class)***

154.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as fully stated herein.

155.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class members against Defendant.

156.    Plaintiffs and the Nationwide Class conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

157.    Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiffs and the Nationwide Class members.

158.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Nationwide Class members' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendant failed to disclose on the Products' packaging that the Products were addictive and similar to opioids. This caused injuries to Plaintiffs and the Nationwide Class because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

159.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiffs and the Nationwide Class members.

160.   Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

161.   Plaintiffs and the Nationwide Class members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

162.   As a direct and proximate result of Defendant's actions, Plaintiffs and the Nationwide Class members have suffered in an amount to be proven at trial.

163.   Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

164.   Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## NINTH CAUSE OF ACTION
### Fraud by Omission
### *(On Behalf of Plaintiffs and the Nationwide Class)*

165.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

166.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

167.   Defendant distributed its Products throughout the United States, including within the States of California, New York, and Oregon.

168.   Defendant misrepresented that its kratom Products had attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

169.   Defendant knows that kratom is addictive because it interacts with kratom vendors and has received consumer reports of addiction and withdrawal.

170.  Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers because addiction is an unreasonable health hazard.

171.  Defendant therefore had a duty to Plaintiffs and to the Nationwide Class members to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

172.  Consumers reasonably and justifiably relied on Defendant's omissions, because it is reasonable to assume that a product which is addictive like an opioid would bear a warning on its packaging.

173.  As a result of Defendant's omissions, Plaintiffs and the Nationwide Class paid for kratom Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about kratom.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, and on behalf of the Classes, respectfully request this Court award relief against Defendant as follows:

a.  an order certifying the Classes and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

b.  award Plaintiffs and members of the Classes actual, consequential, punitive, and statutory damages, as appropriate;

c.  award restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices described herein;

d.  award declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing its unlawful practices set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money it is required to pay;

e.  order Defendant to engage in a corrective advertising campaign;

f.  award attorneys' fees and costs; and

CLASS ACTION COMPLAINT

g.    award any other further relief as the Court may deem necessary or appropriate.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 28, 2024

                              **LYNCH CARPENTER, LLP**

                    By:   */s/Todd D. Carpenter*
                          Todd D. Carpenter (State Bar No. 234464)
                          todd@lcllp.com
                          Scott G. Braden (State Bar No. 305051)
                          scott@lcllp.com
                          James B. Drimmer (State Bar No. 196890)
                          jim@lcllp.com
                          1234 Camino Del Mar
                          Del Mar, CA 92014
                          Telephone:  (619) 762-1910
                          Facsimile:   (858) 313-1850

                          *Attorneys for Plaintiffs and*
                          *Proposed Class Counsel*